Clifford Eugene **DAVIS,** Jr., a minor, by his father and next friend, Clifford Eugene Davis, Sr., etc., et al.

v.

**EAST BATON ROUGE PARISH SCHOOL BOARD,** a corporation, and Lloyd Funchess, as Superintendent of Public Schools in East Baton Rouge Parish.

Civ. A. No. 1662.

United States District Court, M. D. Louisiana.

Aug. 21, 1975.

Robert C. Williams, Williams & Eames, Baton Rouge, La., Murphy W. Bell, Baton Rouge, La., for plaintiffs-intervenors.

John F. Ward, Jr., Baton Rouge, La., for East Baton Rouge Parish School Board.

E. GORDON WEST, District Judge:

This suit, seeking to desegregate the East Baton Rouge Parish school system, was originally filed on February 29, 1956, almost 20 years ago. Over the years, many hearings have been held and many orders have been issued by this Court in an effort to bring the

operation of this school system within the requirements of the United States Constitution as it understood those requirements to be.

The East Baton Rouge Parish School Board has, in each instance, been totally cooperative and has at all times made a good faith effort to comply with the orders issued. Indeed, it has in fact always complied with the orders of this Court. Today, no student in the East Baton Rouge Parish school system is denied either the right or the opportunity to attend an integrated school. In accordance with sound educational principles, the neighborhood school system has, as much as possible, been preserved. This Court, in all of its hearings in connection with the operation of nine separate public school systems, including the East Baton Rouge Parish system, has never heard a single qualified educator state that the neighborhood concept for school attendance is not a sound educational concept. Indeed, the almost unanimous opinion of those who have testified before this Court is that if we are truly interested in the educational welfare of the children involved, the neghborhood concept, at least as far as initial assignment is concerned, should be preserved at all cost. The East Baton Rouge Parish School Board has consistently endeavored to preserve and apply this concept in assigning students to the many schools in its system. Because of purely voluntary housing patterns throughout the Parish of East Baton Rouge, this has, of course, resulted in some schools having an initial assignment of all black students and some having an initial assignment of all white students. Out of the total of 108 schools in the system, 20 are all black and 2 are all white. All other schools have racially mixed student bodies to varying degrees.

It seems to have become a custom for some lawyers to file a motion in this case each year before school starts seeking what they broadly refer to as "Supplemental Relief." It is such a motion that is presently before the Court.

After this rather vague motion was filed, conferences were held with counsel for all parties present. All aspects of the East Baton Rouge Parish school operations were discussed, and the Court tried diligently to ascertain exactly what the attorney who filed the motion was seeking. The only concrete thing that emerged from these conferences as far as the Court could determine was that there were really no "plaintiffs" involved; that the attorney was appearing as an "intervenor"; that no parents of children in the system were appearing to voice any complaints; and that the only thing sought by the attorney-intervenor was "more integration." The Court was unable to elicit any constructive suggestions from the attorney-intervenor, and it was obvious that the requested "more integration" was being sought solely for sociological reasons rather than for the purpose of improved educational opportunity for children. On the basis of these conferences, the Court would have been justified in simply denying the motion for "supplemental relief." However, out of an abundance of caution, and in an effort to obtain the opinion of experts completely detached from the East Baton Rouge Parish school system, the Court appointed the Louisiana Educational Laboratory (LEL) to act as a court-appointed expert to investigate the entire operation of the East Baton Rouge Parish school system and to advise and the assist the Court in determining what action, if any, was needed to bring the East Baton Rouge Parish school system into compliance with the prior desegregation orders of this Court and with present constitutional requirements. At a cost of $27,949.89, borne by the East Baton Rouge Parish School Board, the LEL made an intensive study of the entire school system and filed two comprehensive reports with the Court, a preliminary report dated December 23, 1974, and a final report dated May 1, 1975. These reports have been made a part of the record.

Following receipt of the first report, and after conferences with counsel, the

Court issued an order dated February 26, 1975, whereby it ordered certain recommendations of the LEL implemented. These recommendations related to the appointment of blacks to the School Board staff at the decision making and planning levels; further implementation of majority to minority transfer provisions including provisions for furnishing transportation to transferees; re-constituting the Bi-Racial Committee; reexamination of distribution of teachers on basis of race and experience; and re-examination of attendance zones. Evidence since that time has shown that this order has been fully complied with.

■ Following receipt and distribution of the final report of May 1, 1975, an evidentiary hearing was held. At that hearing the only witnesses called by the "attorney-intervenor" were Dr. Lionel O. Pellegrin, the LEL staff member who authored the reports; Dr. John Moland, Jr., a teacher and researcher at Southern University; and Mr. Ed Steimel, of the Public Affairs Research Council (PAR). No plaintiffs were called, and no complainants were presented in court. The sum total of the evidence adduced from these witnesses was (1) students in the Baton Rouge school system are not being denied access to any public school because of race; (2) all students in the East Baton Rouge Parish school system are being offered equal and high quality education; and (3) further forced mixing of the races in the various schools would not in any way improve the quality of education being offered students in the East Baton Rouge Parish schools. This in essence, was the testimony offered by the "attorney-intervenor" in support of his request for "supplemental relief." All witnesses testified that as a general rule, assignment on the neighborhood school basis produces the best educational opportunity because it produces greater interplay between students, parents, and teachers, and it creates more stability in the school system. Dr. Moland stated that in his opinion, while the neighborhood concept does not always

enhance desegregation because of the fact that white students tend to move out when the ratio of blacks to whites becomes too large, placing a few white students in a predominantly black school does not improve the educational quality of the school. He concluded that such a move is purely sociological and does not necessarily enhance the educational opportunity available to students. This was one of the plaintiff's witnesses. Mr. Ed Steimel, the only other witness called by the intervenor, based his testimony primarily on the recent report of Dr. James S. Coleman, the University of Chicago sociologist who originally supported the concept of massive bussing to achieve forced racial balance in public schools. But he, in his most recent report, concludes that "You can't create integration by court edict" alone. Based largely on Dr. Coleman's report, Mr. Steimel concluded that it is far better from an educational standpoint to keep schools either all black, or with a majority of white students. He concluded that experience has shown that black students learn better when their school is all black than they do where there is only a token number of whites mixed in. This was the testimony of another one of plaintiff's witnesses. This observation, allegedly supported by Dr. Coleman's report, is important when considering the validity of attendance zones established by the School Board. The evidence in this case makes it abundantly clear that there is no forced segregation of the races in the East Baton Rouge Parish school system, and that every student has the opportunity to attend an integrated school, with transportation furnished, if he wishes to do so. Whatever segregation exists, as it does in a few all black and all white schools in the system, exists by deliberate choice and because of legitimate, voluntary neighborhood patterns. To force a few white students to attend a few all black schools, or to force a few black students to attend the two all white schools, solely for the purpose of being able to say that 100 per cent of the schools in the

system have racially mixed student bodies would be the height of foolishness. If there was any credible evidence to suggest that the students involved in a presently all black or all white school would be afforded better educational opportunity by sending a few students of the opposite race there, a valid argument might be made for doing so. But experience, as well as the evidence in this case, has shown the opposite to be true. It must be remembered that the true objective in this whole school integration turmoil was supposed to be to improve the quality of education available to all students. The objective was never intended to be to reduce educational opportunity to the lowest common denominator, nor to play a "constitutional numbers game" with a view to being able to merely say that certain pre-determined ratios of mixing have been achieved, across the board, in all schools, without regard to its effect on the quality of education being offered the students involved. It is imperative that we immediately turn away from the absurd course that some would have us follow whereby court decrees are sought and used in school desegregation cases for the sole purpose of bringing about some sought after sociological change rather than for the purpose of securing to all students, regardless of race, their constitutional right to equal educational opportunity.

The Federal Courts have demonstrated their ability and their determination to see that constitutional rights, as they pertain to equal educational opportunity for all students, are protected. This they should, of course, do. But the Courts should be equally determined to see that they are not used, or mis-used, for the purpose of bringing about purely sociological changes that do not fall within the limited jurisdiction granted to the Federal Courts by the Congress and by the Constititution.

Public Law 93–380, known as the Equal Educational Opportunities Act of 1974, became effective on August 21, 1974. Title II of this Act, (hereafter "the Act"), deals with the Equal Educational Opportunities of Students. See 20 U.S.C.A. §§ 1701–1720, 1751, 1752–1758. Section 202 of the Act re-establishes the policy that all children are entitled to equal educational opportunity, and that the neighborhood is the appropriate basis for public school assignment. Section 205 indicates that lack of balance on the basis of race is not necessarily a denial of equal educational opportunity. Section 206 states that assignment of students on a neighborhood basis is not a denial of equal educational opportunity unless such assignment is for the purpose of segregation or unless the school was purposely located on the site for the purpose of segregation. Such is not the case in the East Baton Rouge Parish system. Section 208 provides that once a school system is determined by the Court to be desegregated, or unitary, school population changes shall not per se constitute a cause for a new plan of desegregation. The evidence in this case shows conclusively that the East Baton Rouge Parish school system has been desegregated, and is a unitary system, and there is no evidence to justify the ordering of a new plan of desegregation. Section 213 calls for imposition of only such remedies as are essential to correct particular denials of equal educational opportunity or equal protection of the laws. Neither the LEL, in its intensive and extensive investigation, nor this Court finds any evidence of denial of equal educational opportunity or equal protection of the laws in the East Baton Rouge Parish school system. The attorney-intervenor in this case would have the Court order massive bussing for the sole purpose of achieving a greater percentage of racial mixing in each school. The mere suggestion of this is preposterous and any such order would be clearly illegal. Section 214 of the Act establishes a priority of remedies, if indeed remedies were found necessary. Included in these remedies

is the assignment of students to the closest school, permitting majority to minority transfers, creation of attendance zones that will not require transportation, and establishment of magnet schools. All of these things are either being done, or are currently under study by the East Baton Rouge Parish school system. But further than this, the Act specifically provides that the provisions of Section 214 are subject to the provisions of Section 215 which specifically limits transportation of students to schools closest or next closest to the place of residence of the student. Then, to emphasize the intent of Congress, the Act, in Section 251 specifically states that the Act shall not be interpreted to require the use of transportation of students to overcome a racial imbalance. These are among the pertinent provisions of the Equal Educational Opportunities Act of 1974. While the Act provides in Section 203(b) that the provisions of the Act are not intended to modify the authority of a court to fully enforce the Fifth and Fourteenth Amendments, this provision is no license for the Federal Courts to ignore or thwart the clear intent of Congress. The enumeration by Congress of the things that should not be done for the purpose of achieving some predetermined degree of racial mixing in schools is an unambiguous indication of the intent of Congress. The Courts should be bound by those proscriptions, and it should be only in cases where lack of integration in a particular school is the result of some positive act on the part of the state, the municipality, or the school authorities to further segregation that the reference to the Fifth and Fourteenth Amendments in the Act becomes important. There is no evidence in this case of Fifth or Fourteenth Amendment violations.

The evidence and the record in this case shows without question of doubt that the East Baton Rouge Parish school system is indeed a unitary, desegregated school system and that it is being operated in compliance with the Constitution and laws of the United States. It is being operated in complete accord with the Equal Educational Opportunities Act of 1974, supra, and there is not the slightest indication present of any violation of the prior orders of this Court.

The final report of the LEL contained several suggestions and recommendations pertaining to the future operation of the schools. While many of these suggestions obviously have merit and should be seriously considered by the School Board, they are, nevertheless, not changes that are required by law or by court order. Several of the recommended changes have been implemented, for which the School Board should be commended. They have added two black administrators at policy making level to the staff. The suggested extension of the majority to minority transfer provision has been widely publicized and implemented. Not only has transportation been provided for those requesting transfer, but transportation is provided for students who wish to take a look at another school in which he might be interested. Applications for transfer are being encouraged. A new Bi-Racial Committee has been organized and meets on a regular basis. This Committee has under active consideration such items as teacher assignment, attendance zones, consolidation of schools, and establishment of magnet schools. Many of the LEL recommendations, such as those pertaining to Staff Organization, Responsibility of the School Board, Staff Responsibility, etc., while undoubtedly having merit, are not matters over which this Court should exercise jurisdiction. However, as the evidence clearly shows, most of those recommendations have either been implemented or are under serious consideration by the School Board and by the Bi-Racial Committee. As to the specific recomendations made by LEL pertaining to attendance zone changes, the Court concludes that these recommended changes are not required in order to bring the system into compliance with either the law or prior orders of this Court. While some of the

recommendations may have merit, the question of whether or not they are to be followed by the School Board is entirely a matter of school administration, and not a matter to be decided by the Court. Most, if not all, of the recommended changes in attendance zones would have only a minimal effect on the degree of integration of student bodies. None of the recommended changes are required either by law or by prior order of the Court, and there is no evidence to suggest that the recommended changes in attendance zones would substantially affect the quality of education being offered the students in the system. While good school administration would suggest a constant review of such things as transportation routes, school attendance zones, etc., this Court concludes that in view of the record in this case, no mandatory changes in attendance zones is indicated. This Court further finds, as a fact, that the East Baton Rouge Parish school system is a unitary system being operated on a nondiscriminatory basis, in accordance with the requirements of law and the prior orders of the Court.

■ This case has now been under the continuing jurisdiction of this Court for close to 20 years. The retention of such jurisdiction was mandated by the Supreme Court in *Brown v. Board of Education of Topeka, Kansas,* 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083. The Court said that the District Courts should supervise the transition of school sytems from segregated to unitary systems, and that *"During this period of transition* the Courts will retain jurisdiction of these cases." (Emphasis added.) This mandate, by clear implication, requires that at the end of the period of transition, or when the school system has been declared to be a unitary system, the jurisdiction of the Court over that particular case should come to an end. There is good reason for this as the present case clearly shows. The transition has been completed. There are no longer any plain-

tiffs in this suit. Retention of jurisdiction perpetuates an intolerable "motion practice" in these school cases which denies the school boards the fundamental right to be sued only by a plaintiff who must carry the burden of proving his case. This "motion practice" that has developed and has been perpetuated in these desegregation cases enables people, such as the attorney-intervenor in this case, to simply file a motion, obtain a show cause order, and thus shift the burden of proof to the School Board. This procedure had its place during the early stages of the desegregation process. But after the school system has been declared to be a unitary system, operating in accordance with law and constitutional principles, the transition is complete even though further improvements may be made or future violations may occur. After 20 years, this school system has been and is now declared to be a unitary system. The time has come to say that if future causes of action arise in connection with the administration of the East Baton Rouge Parish school system, the complainant must follow the long established principles of our law and file his suit as in any other civil proceeding, permit the defendant to answer the suit, and then proceed, if he can, to carry the burden of proving his case by a preponderance of the evidence. The dual standard that has been established in these school cases should be terminated as soon as the school board has been found to be operating the school system in accordance with law. The constant harassment of school boards by those who are permitted to engage in this unjustified "motion practice" is costly to the school system, costly to the people of the community, and detrimental to the operation of the schools. We must return to the long accepted principle that he who asserts the affirmative of an issue in a civil case must carry the burden of proving it by a preponderance of the evidence. The school board, after having been found to have converted its system to

a unitary system, should no longer be presumed to be guilty and thus required to prove its innocence. The East Baton Rouge Parish school system is a unitary system, and there are simply no justiciable issues left in this particular case. If new causes of action arise, they must be the subject of new suits.

Therefore, for these reasons, the demands of the "plaintiff-intervenor" for "supplemental relief" will be denied, and this suit will be dismissed and closed. Judgment will be entered accordingly.